**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | |
|---|---|
| **BRENDA PULLEY, ADMINISTRATOR OF THE** )<br>**ESTATE OF EVERETTE BERNARD PULLEY,** )<br>**DECEASED,** )<br> )<br>    **Plaintiff,** )<br> )<br>**v.** )<br> )<br>**UNITED STATES OF AMERICA,** )<br>    **Thomas T. Cullen, United States Attorney** )<br>    **310 1st Street, S.W., Room 906** )<br>    **Roanoke, Virginia 24011** )<br> )<br>**MARK AINSLEY INNIS, M.D.,** )<br>    **SOVAH Danville** )<br>    **421 South Main Street** )<br>    **Danville, Virginia 24541** )<br> )<br>    **AND** )<br> )<br>**EMERGENCY COVERAGE CORPORATION,** )<br>    **Corporation Service Company, Its Registered** )<br>        **Agent** )<br>    **100 Shockhoe Slip, Floor 2** )<br>    **Richmond, Virginia 23219** )<br> )<br>    **Defendants.** ) | **CASE NO.** `7:20CV154` |

## COMPLAINT

COMES NOW Plaintiff, by counsel, and files her Complaint against the defendants and

states as follows in support thereof:

PARTIES, VENUE AND JURISDICTION

1. On July 16, 2018 Everette Bernard Pulley ("Mr. Pulley") passed away at Lynchburg

   General Hospital ("LGH") as a result of hypovolemic shock due to a gastrointestinal

   bleed. Here is a photograph of Mr. Pulley:

1



2. Mr. Pulley passed away at the age of 85 surrounded by his loving family.  He was born in March 1933, in Brunswick, Virginia, to the late Andrew Pulley and the late Nona Powell Pulley. He was married for 32 years to Brenda Sheppard Pulley. He was a member of Shermont Baptist Church. He was a past Commander of the Danville Archer Gammon Post, Chapter 19 and a member of American Legion Post 325. He was an avid wood worker. He had two biological children and five stepchildren, who he loved as his own but never legally adopted.

3. On June 5, 2019 in the Danville Circuit Court Brenda Pulley duly qualified, under the provisions of Virginia Code § 64.2-454, as Administrator of the Estate of Everette Bernard Pulley, deceased.

4. Plaintiff certifies that she has obtained from expert witnesses, whom the plaintiff reasonably believe would qualify as expert witnesses pursuant to subsection A of § 8.01-581.20, written opinions signed by the expert witnesses that, based upon a reasonable understanding of the facts, the defendants for whom service of process has been requested deviated from the applicable standard of care and the deviations were a proximate cause of the injuries and death claimed.

2

5.   By certified letter dated July 9, 2019, Plaintiff timely and properly presented this claim against the United States of America through a Notice of Claim pursuant to 28 U.S.C. § 2675 of the Federal Tort Claims Act on the appropriate federal agency (United States Department of Veterans Affairs) and such claim was received by the United States Department of Veterans Affairs on July 11, 2019.

6.   The United States Department of Veterans Affairs has not responded to Plaintiff's timely and properly presented Notice of Claim pursuant to 28 U.S.C. § 2675 of the Federal Tort Claims Act despite contacts and requests by Plaintiff's counsel.

7.   More than six months have run since Plaintiff's Notice of Claim was received by the United States Department of Veterans Affairs and hence, pursuant to 28 U.S.C. § 2675, Plaintiff deems the fact that the United States Department of Veterans Affairs failed to make a final disposition of the claim within six months after it was filed to be a final denial of the claim for purposes of the Federal Tort Claims Act.

8.   As a result, this action is now being instituted upon a claim against the United States of America for money damages for death caused by the negligent, wrongful acts, and/or omissions of employees of the United States of America while acting within the scope of their offices or employments.

9.   At all times and places pertinent to this action, the United States of America acted by and through its employees including, but not limited to: Mohamed Sageer, M.D.[1] (gastroenterologist), Katherine C. Siever, P.A. (gastroenterology mid-level provider), Charlotte C. Gearhart (administrative officer of the day), Suchet Hemendra Sarda, M.D.

---

[1] Note that Dr. Sageer was not a "health care provider" as defined under Virginia law (Virginia Code § 8.01-581.1) because, as the times and places pertinent to this action, Dr. Sageer was not licensed to practice medicine in the Commonwealth of Virginia.  As a result, the medical malpractice cap does not apply to the United States of America for Dr. Sageer's acts of malpractice.

(internist/hospitalist), Termecka Brown, R.N. (staff nurse), and Traci J. Westberg, R.N. (transfer nurse).

10. At all times and places pertinent to this action, Dr. Sageer, Ms. Siever, Ms. Gearhart, Dr. Sarda, Ms. Brown, and Ms. Westberg acted in the course and scope of their offices and/or employment as employees of the United States of America.

11. Under the doctrine of *respondeat superior*, the United States of America is liable for the negligent, wrongful acts, and/or omissions of its employees acting in the course and scope of their offices and/or employment including, but not limited to, Dr. Sageer, Ms. Siever, Ms. Gearhart, Dr. Sarda, Ms. Brown, and Ms. Westberg.

12. Pursuant to the Federal Tort Claims Act, the United States is liable in the same manner and to the same extent as a private individual under like circumstances for the negligent, wrongful acts, and/or omissions of its employees including, but not limited to, Dr. Sageer, Ms. Siever, Ms. Gearhart, Dr. Sarda, Ms. Brown, and Ms. Westberg.

13. At all times and places pertinent to this action, Mark Ainsley Innis, M.D. acted in the course and scope of his employment as an employee of Emergency Coverage Corporation.

14. At all times and places pertinent to this action, Emergency Coverage Corporation acted by and through its employees including, but not limited to, Dr. Innis.

15. At all times and places pertinent to this action, Emergency Coverage Corporation billed for the services rendered by Dr. Innis.  For example, and not by way of limitation, Emergency Coverage Corporation billed $1,198.00 for the services rendered by Dr. Innis to Mr. Pulley on July 13-14, 2018.

16. Under the doctrine of *respondeat superior*, Emergency Coverage Corporation is liable for the negligent, wrongful acts, and/or omissions of its employees including, but not limited to, Dr. Innis.

17. This Court has original jurisdiction over the claim against the United States of America pursuant to 28 U.S.C. § 1346(b) because this is a civil action on a claim against the United States of America for money damages, accruing on and after January 1, 1945, for personal injury and death caused by the negligent, wrongful acts, and/or omissions of employees of the United States of America while acting within the scope of their office and/or employment, under circumstances where the United States, if a private person, would be liable to the Plaintiff in accordance with the law of the Commonwealth of Virginia where the acts and omissions occurred.

18. Venue is appropriate in the Roanoke Division pursuant to 28 U.S.C. § 1402 because this is a civil action on a tort claim against the United States of America under 28 U.S.C. § 1346(b) for acts and omissions that occurred in this judicial district.

19. This Court has supplemental jurisdiction over the claim against Dr. Innis and Emergency Coverage Corporation pursuant to 28 U.S.C. § 1367 because such claim is so related to the claim in this action against the United States of America for which this Court has original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Moreover, the claim against Dr. Innis and Emergency Coverage Corporation does not raise a novel or complex issue of state law; it does not substantially predominate over the claim against the United States of America for which this Court has original jurisdiction; and there are no compelling reasons for declining jurisdiction.

FACTS AND ASSERTIONS

20. On July 16, 2018 Mr. Pulley died at LGH as a result of hypovolemic shock due to a gastrointestinal bleed.

21. Hypovolemic shock is a life-threatening condition that results when a person loses more than 20 percent (one-fifth) of his body's blood supply. This severe blood loss makes it impossible for the heart to pump enough blood to the patient's body. Blood carries oxygen and other essential substances to organs and tissues. When heavy bleeding occurs, there is not enough blood in circulation for the heart to be an effective pump. Once the human body loses these substances faster than it can replace them, organs in the body begin to shut down and the symptoms of shock occur. Blood pressure plummets, which can be life-threatening. Hypovolemic shock can lead to organ failure and death if not timely and properly treated. Hypovolemic shock is dangerous for everyone, but it is particularly dangerous in older adults.

22. On July 5, 2018 (11 days before Mr. Pulley's death) Mr. Pulley saw Ms. Siever at the Salem Veterans Affairs Medical Center ("Salem VAMC") for a gastroenterology consultation. Ms. Siever deviated from the standard of care by recommending, agreeing to perform, and ordering the scheduling of a colonoscopy for Mr. Pulley. The standard of care demanded that Ms. Siever not recommend, agree to perform, or schedule Mr. Pulley for a colonoscopy because it was an unindicated procedure given his age and pre-morbid condition. As even Dr. Sageer noted at the conclusion of Mr. Pulley's colonoscopy: "I would not recommend a surveillance colonoscopy given age over 85 years." Further, Dr. Sageer communicated in his July 17, 2018 letter as follows: "Current guidelines do not recommend repeat colonoscopies beyond 85 years of age." And even the

6

gastroenterologist who performed Mr. Pulley's colonoscopy five years previously did not recommend any further colonoscopies: "colonoscopy approximately 5 years ago and per patient it was normal and reports that provider who did the procedure did not recommend having another procedure." Mr. Pulley was not actively bleeding, and the risks of colonoscopy greatly outweighed any alleged benefits. Even if it was pretended that Mr. Pulley had colon cancer (which he did not) or a polyp that would develop into colon cancer, the natural progression of colon cancer is such that Mr. Pulley would not have died as a result of it.

23. Prior to seeing Mr. Pulley on July 5, 2018, Ms. Siever knew that there were many risks of colonoscopy including, but not limited to, bleeding and death. Ms. Siever knew that bleeding can occur during the procedure or up to one to two weeks later; bleeding usually happens when polyps are biopsied or removed; if polyps are removed, the risk of bleeding is about one in 300; if the polyp is large, the risk is about one in 20; and the risk of death in the procedure is between one in 3,500 and one in 5,000. Ms. Siever knew or should have known that the risks of bleeding and death were increased with Mr. Pulley given many factors including, but not limited to, his medications (Plavix and Aspirin) and cirrhosis. Ms. Siever knew that there were alternatives to colonoscopy for Mr. Pulley (including, but not limited to, colon x-ray; stools tests; other workups; and doing nothing) but recommended to Mr. Pulley that he undergo the colonoscopy.

24. By July 5, 2018 Ms. Siever knew that Mr. Pulley was 85 years old and had "colonoscopy approximately 5 years ago and per patient it was normal and reports that provider who did the procedure did not recommend having another procedure." Ms. Siever knew about Mr. Pulley's past medical history including, but not limited to, congestive heart failure,

coronary artery disease, history of stroke, and atrial fibrillation. Ms. Siever knew about Mr. Pulley's past medical history including, but not limited to, cardiac catheterization with percutaneous coronary intervention with four stents total. Ms. Siever knew about Mr. Pulley's medications including, but not limited to, Plavix and Aspirin 81 mg daily.

25. On July 5, 2018 Ms. Siever recommended to Mr. Pulley that he undergo a colonoscopy and her justification was as follows: "patient had colonoscopy greater than 10 years ago in Danville per Dr. Spainhour—was within normal limits. Recently had melena and drop in hemoglobin. Saw local gastroenterologist and had endoscopy with findings of erosive gastritis, no esophageal varices. Patient is requesting colonoscopy at the VA. Has atrial fibrillation and is on anticoagulation." Ms. Siever agreed for the colonoscopy to be performed and ordered that it be scheduled.

26. There is no evidence in the Salem VAMC medical records that Ms. Siever obtained Mr. Pulley's pertinent medical records including those from Danville Regional Medical Center d/b/a SOVAH Health-Danville ("DRMC"). This is a deviation from the standard of care because the standard of care required Ms. Siever (and Dr. Sageer since Ms. Siever had not done so) to obtain such medical records to properly understand Mr. Pulley's condition and treatment. For example, such records would have shown Ms. Siever and Dr. Sageer that Mr. Pulley was diagnosed with chronic thrombocytopenia during his February 9, 2018 admission with no indication of melena (dark sticky feces containing partly digested blood), hematochezia (refers to the passing of blood from the anus mixed with stools or sometimes blood clots), bright red blood per rectum, hematemesis (vomiting of blood), coffee-ground emesis, nausea, or vomiting. Thrombocytopenia is a deficiency of platelets in the blood, and it causes bleeding into the tissues, bruising, and

slow blood clotting after injury.  Also, such records would have shown Ms. Siever and Dr. Sageer that Mr. Pulley was diagnosed with liver cirrhosis with easy bruising and bleeding during his May 15, 2018 admission, for which an outpatient endoscopy was recommended but not a colonoscopy.  Further, such records would have shown that on May 18, 2018 Bhushman Pandya, M.D., a gastroenterologist in Danville, performed an outpatient endoscopy on Mr. Pulley finding erosive gastritis but no esophageal varices, and he did not recommend a colonoscopy; instead, he suggested (and documented in his records) follow-up with himself or the Salem Veterans Affairs Medical Center while continuing omeprazole and checking his CBC and H. pylori antibody.  Omeprazole is a proton pump inhibitor that decreases the amount of acid produced in the stomach. Omeprazole is used to treat symptoms of gastroesophageal reflux disease (GERD) and other conditions caused by excess stomach acid. It is also used to promote healing of erosive esophagitis (damage to your esophagus caused by stomach acid).  *Helicobacter pylori* (*H. pylori*) is a type of bacteria. These germs can enter your body and live in your digestive tract. After many years, they can cause sores, called ulcers, in the lining of your stomach or the upper part of your small intestine.  If Ms. Siever and/or Dr. Sageer had obtained Mr. Pulley's pertinent medical records as required by the standard of care, the information they would have learned would have further caused a reasonably prudent gastroenterology provider to not recommend, order, or perform a colonoscopy on Mr. Pulley.

27. On July 12, 2018 (four days before Mr. Pulley's death) Dr. Sageer (utilizing the assistant of Kari Wygal, R.N. and a nurse Nicole Dykes, R.N.) performed the colonoscopy on Mr.

Pulley at the Salem VAMC.  Dr. Sageer's indication for the colonoscopy was "[r]ecent hospitalization for hematochezia and acute posthemorrhagic anemia."

28. By July 12, 2018 Dr. Sageer knew that Mr. Pulley was 85 years old and had "colonoscopy approximately 5 years ago and per patient it was normal and reports that provider who did the procedure did not recommend having another procedure."  Dr. Sageer knew about Mr. Pulley's past medical history including, but not limited to, congestive heart failure, coronary artery disease, history of stroke, and atrial fibrillation. Dr. Sageer knew about Mr. Pulley's past medical history including, but not limited to, cardiac catheterization with percutaneous coronary intervention with four stents total. Dr. Sageer knew about Mr. Pulley's medications including, but not limited to, Plavix and Aspirin 81 mg daily.  Dr. Sageer recommended to Mr. Pulley that he undergo a colonoscopy.

29. It was a deviation from the standard of care for Dr. Sageer to recommend and perform a colonoscopy on Mr. Pulley because it was an unindicated procedure given his age and pre-morbid condition.  As even Dr. Sageer noted at the conclusion of Mr. Pulley's colonoscopy: "I would not recommend a surveillance colonoscopy given age over 85 years."  Further, Dr. Sageer communicated in his July 17, 2018 letter as follows: "Current guidelines do not recommend repeat colonoscopies beyond 85 years of age."  The standard of care required Dr. Sageer to not recommend or perform the colonoscopy on Mr. Pulley.  Mr. Pulley was not actively bleeding, and the risks of colonoscopy greatly outweighed any alleged benefits.  Even if it was pretended that Mr. Pulley had colon cancer (which he did not) or a polyp that would develop into colon cancer, the natural progression of colon cancer is such that Mr. Pulley would not have died as a result of it.

30. Prior to seeing Mr. Pulley on July 12, 2018, Dr. Sageer knew that there were many risks of colonoscopy including, but not limited to, bleeding and death.  Dr. Sageer knew that bleeding can occur during the procedure or up to one to two weeks later; bleeding usually happens when polyps are biopsied or removed; if polyps are removed, the risk of bleeding is about one in 300; if the polyp is large, the risk is about one in 20; and the risk of death in the procedure is between one in 3,500 and one in 5,000.  Dr. Sageer knew or should have known that the risks of bleeding and death were increased with Mr. Pulley given many factors including, but not limited to, his medications (Plavix and Aspirin) and cirrhosis.  Dr. Sageer knew that there were alternatives to colonoscopy for Mr. Pulley (including, but not limited to, colon x-ray; stools tests; other workups; and doing nothing) but recommended to Mr. Pulley that he undergo the colonoscopy and performed the colonoscopy on him.

31. During the colonoscopy, Dr. Sageer removed a total of 19 polyps using hot snare and cold snare techniques.  Polyps are masses of fleshy tissue and, in the bowel, they grow from epithelial tissue in the wall of the intestine, projecting into the inner space.  A 1 cm polyp was removed from the cecum; 1.5 cm x 2 polyps, 8 mm polyp x 1; 7 mm polyp x 3, and 5 mm polyp x 2 were removed from the ascending colon. 1-2 cm polyps x 2, 7-8 mm polyps x 4, and a 5 mm polyp were removed from the transverse colon.  Another 3 polyps each measured around 3 mm were removed from the sigmoid colon.

32. Dr. Sageer compounded his deviations from the standard of care in recommending and performing the colonoscopy by deviating from the standard of care in his actual performance of it.  It was a deviation from the standard of care to remove a total of 19 polyps as he did.  There was no reason to remove these 19 polyps, much less using a

snare.  Dr. Sageer knew the tremendously increased risks of bleeding and death to which

he was exposing Mr. Pulley as a result of his decision to remove these 19 polyps as he

did.  If Dr. Sageer was concerned with the large polyp (pathology identified the largest

polyp as a 1 x 1 cm that was cross-sectioned), he should have biopsied it instead of

removing it but, again, the risks of intervention greatly exceeded any alleged benefits.

The standard of care required Dr. Sageer to not remove these 19 polyps as he did.

33. The pathology from Dr. Sageer's colonoscopy showed multiple tubular adenomas and

tubulovillous adenoma (adenomatous change very close to excision margins which

appear uninvolved) for the right colon polyps and two tubular adenomas for the left

colon.  Tubular adenomas are the most common polyps found in the colon and they are

usually harmless.  A tubulovillous adenoma, or TVA, is a type of benign polyp found in

the lower parts of the digestive tract. As. Dr. Sageer communicated by letter dated July

17, 2018: "All polyps were benign tumors and DID NOT SHOW cancer…."

34. To worsen Dr. Sageer's deviations in recommending and performing the colonoscopy

and his actual performance of it, he deviated from the standard of care in his post-

colonoscopy care of Mr. Pulley.  Dr. Sageer's orders after the colonoscopy included

discharging Mr. Pulley home while resuming all his current medications including

Aspirin 81 mg daily, but avoiding all other blood thinners (antiplatelets, anticoagulants

and NSAIDs) for ten days.  Dr. Sageer knew that Aspirin, including doses of 81 mg daily,

can cause gastrointestinal bleeding or potentiate it, especially in the face of colonoscopies

with polyp removal.  Small doses of aspirin, which are perhaps 10 to 20 times lower than

that used for pain relief, are strong enough to knock out the platelets in blood and thin it

down. The benefit of thinning the blood is that you are less likely to have clots causing

strokes or heart attacks. But you can't have this benefit without at the same time running the risk of bleeding in the gut. The standard of care required Dr. Sageer to not discharge Mr. Pulley home, to observe Mr. Pulley for risks of bleeding, and to not allow Mr. Pulley to resume any medications that could cause or potentiate gastrointestinal bleeding, such as Aspirin 81 mg daily. The standard of care required Dr. Sageer to not allow Mr. Pulley to resume his Aspirin 81 mg daily until at least three days after the colonoscopy.

35. On July 13, 2018 (one day after Mr. Pulley's colonoscopy and three days before his death) around 8:49 p.m. Mr. Pulley was taken by emergency services personnel from the Danville Life Saving Crew to DRMC's emergency department for acute abdominal pain with bleeding from the rectum, and the primary impression was hemorrhage.

36. Mr. Pulley arrived at DRMC's emergency department around 9 p.m. with a history of having undergone a colonoscopy with removal of 19 polyps the day before at the Salem VAMC with bright red rectal bleeding, weakness, and lightheadedness to the point that he felt like he was going to pass out. Mr. Pulley's acuity was rated as urgent.

37. At 9 p.m. Mr. Pulley's blood pressure was 160/86.

38. Around 9:20 p.m. Dr. Innis was designated as Mr. Pulley's treating emergency room physician, and Mr. Pulley's blood pressure was 144/63.

39. Dr. Innis knew, or should have known, that Mr. Pulley was in danger of a gastrointestinal hemorrhage leading to hypovolemic shock for many reasons including, but not limited to, Mr. Pulley's history of having undergone a colonoscopy with removal of 19 polyps; Mr. Pulley's history of post-colonoscopy bright red rectal bleeding causing weakness, abdominal pain, and lightheadedness to the point that Mr. Pulley felt like he was going to pass out; and Mr. Pulley's liver disease. Also, Dr. Innis knew, or should have known,

that there was little margin for error or deterioration of Mr. Pulley's condition given Mr. Pulley's age, pre-existing history, and current condition.

40. The standard of care required Dr. Innis to immediately consult a gastroenterologist at DRMC, but Dr. Innis did not do this.  If Dr. Innis had done so, he would have learned that there was no gastroenterologist on call at DRMC.  In which case the standard of care required an immediate consult with a surgeon at DRMC, but Dr. Innis did not do this.  If DRMC had surgery on call, a surgeon would have emergently seen Mr. Pulley, resuscitated Mr. Pulley, and operated on Mr. Pulley to stop his acute gastrointestinal hemorrhage thereby saving Mr. Pulley's life.  If DRMC did not have surgery on call, then the standard of care required emergent transfer to a facility that had the resources to treat Mr. Pulley's acute gastrointestinal hemorrhage, but Dr. Innis did not do this. Instead, Dr. Innis kept Mr. Pulley at DRMC without timely and properly resuscitating Mr. Pulley and ensuring that timely surgical treatment was available to Mr. Pulley.

41. At 9:21 p.m. Dr. Innis ordered a complete blood count with auto differential and other laboratory tests including a type and screen.  A type and screen (T&S) determine ABO blood group and Rh type, and screens for clinically significant alloantibodies in case a patient needs blood.  Also, Dr. Innis ordered that Mr. Pulley have nothing by mouth in preparation for a potential surgery for Mr. Pulley's rectal bleeding, but again did not consult gastroenterology or surgery at DRMC or seek an immediate transfer of Mr. Pulley to a facility that had the resources to treat Mr. Pulley's acute gastrointestinal hemorrhage.

42. At 9:25 p.m. Mr. Pulley's blood pressure was 119/58.  Dr. Innis knew, or should have known, that Mr. Pulley's blood pressure was trending downward (hypotensive),

especially given Mr. Pulley's history of high blood pressure (hypertension), and that internal bleeding, such as an acute gastrointestinal hemorrhage, can lead to low blood pressure because of the constant blood loss.

43. At 9:28 p.m. Mr. Pulley's blood was taken for the laboratory studies including the type and screen that Dr. Innis had ordered.

44. At 9:48 p.m. Mr. Pulley's blood was taken for a prothrombin time laboratory study that Dr. Innis had ordered.  A prothrombin time test measures how quickly a person's blood clots.

45. At 9:52 a.m. Mr. Pulley's laboratory studies resulted showing an abnormally low red blood cell count of 3.46 (normal is 4.50-5.90); an abnormally low hematocrit of 29.2 (normal is 41.0-53.0); an abnormally low hemoglobin of 8.5 (normal is 13.5-17.5); abnormally low platelets of 87 (normal is 150-440); and an abnormally low albumin of 2.9 (normal is 3.4-5.0).  Dr. Innis knew, or should have known, that Mr. Pulley had lost a significant amount of his body's volume of blood.  Moreover, Dr. Innis knew, or should have known that acute bleeds, such as that which Mr. Pulley was suffering, may lead to laboratory blood levels that do not correctly reflect the blood status of patients, namely such laboratory blood levels are higher than the actual blood levels of the patient.  This is because laboratory blood levels take time to accommodate for acute bleeds.    Thus, Dr. Innis knew, or should have known, that Mr. Pulley's laboratory blood levels were higher than Mr. Pulley's actual blood levels (namely Mr. Pulley had less blood than was being shown by the laboratory studies).

46. At 9:55 p.m. Mr. Pulley's blood pressure was 124/57.

47. At 10:09 p.m. Dr. Innis ordered Morphine for Mr. Pulley.

48. At 10:12 p.m. Mr. Pulley was given Morphine 4 m.g., and Dr. Innis ordered a CT scan of
    Mr. Pulley's abdomen/pelvis without contrast.

49. At 10:25 p.m. Mr. Pulley's blood pressure was 108/51.  Dr. Innis knew, or should have
    known, that Mr. Pulley's blood pressure was trending further downward (hypotensive)
    indicating ongoing acute gastrointestinal hemorrhage.

50. At 10:55 p.m. Mr. Pulley's blood pressure was 112/55.

51. At 11:18 p.m. Mr. Pulley's blood type resulted showing his blood type was O positive.
    However, Dr. Innis continued to deviate from the standard of care by not timely and
    properly resuscitating Mr. Pulley and immediately consulting a gastroenterologist and
    surgeon and/or immediately transferring Mr. Pulley to a facility with the resources to
    treat Mr. Pulley's condition.

52. It wasn't until approximately 1 a.m. on July 14, 2018 that Dr. Innis first sought a consult
    with a gastroenterologist at DRMC, at which time Dr. Innis learned that there was not a
    gastroenterologist available at DRMC, so Dr. Innis discussed Mr. Pulley's condition with
    the Salem VAMC who agreed to admit Mr. Pulley.

53. The Salem VAMC (Charlotte C. Gearhart-administrative officer of the day) documented
    that on July 14, 2018 at 1:15 a.m. the Salem VAMC received a transfer request from
    SOVAH Health-Danville for Mr. Pulley, who was an emergency room patient with a
    diagnosis of a gastrointestinal bleed.  Suchet Hemendra Sarda, M.D. (internist/hospitalist
    at the Salem VAMC) accepted Mr. Pulley from Dr. Innis and the plan was to admit Mr.
    Pulley to the Salem VAMC's medical intensive care unit.  The Salem VAMC's staff was
    notified including Termecka Brown, R.N. (staff nurse) and Traci J. Westberg, R.N.
    (transfer nurse).

54. At 1:23 a.m. Mr. Pulley's blood pressure was 115/55.  However, Dr. Innis continued to deviate from the standard of care by not timely and properly resuscitating Mr. Pulley and immediately consulting a surgeon at DRMC and/or immediately transferring Mr. Pulley to a facility with the resources to treat Mr. Pulley's condition.

55. At 1:43 a.m. Dr. Innis ordered a prothrombin time laboratory study.

56. At 1:50 a.m. Dr. Innis first documented in Mr. Pulley's chart.  This documentation included that Mr. Pulley arrived to DRMC's emergency department via emergency medical services with complaints of rectal bleeding; Mr. Pulley's rectal bleeding was moderate; the rectal bleeding began on July 13, 2018; Mr. Pulley had undergone a colonoscopy with 19 polyps removed on July 12, 2018 after which he had abdominal pain then bloody bright red bowel movements; and Mr. Pulley had abdominal pain in all quadrants with lower gastrointestinal bleeding.

57. At 1:53 a.m. Dr. Innis documented under review of systems that Mr. Pulley was positive for abdominal pain but negative for rectal bleeding.  And Dr. Innis documented under physical examination that Mr. Pulley was in no acute distress; Mr. Pulley was not in respiratory distress; Mr. Pulley had moderate abdominal tenderness in all quadrant; and Mr. Pulley's rectal examination was positive for gross blood.

58. At 1:55 a.m. Dr. Innis documented his differential diagnosis as abscess, condyloma, fissure, foreign body, hemorrhoids, and pilonidal cyst.  And Dr. Innis documented that Mr. Pulley was not taking Plavix as it was held for Mr. Pulley's colonoscopy; that Dr. Innis reviewed Mr. Pulley's vital signs and nurses' notes; that Mr. Pulley's blood pressure was elevated during the emergency department visit and that Mr. Pulley was instructed to see his primary care provider for continued monitoring and management of

his blood pressure as needed; Mr. Pulley's grossly bloody bowel movements had

decreased; Mr. Pulley's CT scan showed an inflammatory process; and that DRMC did

not have gastroenterology so he discussed with the Salem VAMC who agreed to admit

Mr. Pulley.  Dr. Innis knew, or should have known, that Aspirin was an active medication

for Mr. Pulley.

59. At 1:59 a.m. Dr. Innis ordered Mr. Pulley's transfer to Salem VAMC with Dr. Sarda

being the accepting physician with a diagnosis of rectal bleeding and the reason for the

transfer was that the gastroenterology on call service was not available at DRMC.

However, Dr. Innis continued to deviate from the standard of care by not timely and

properly resuscitating Mr. Pulley and immediately consulting a surgeon at DRMC and/or

immediately transferring Mr. Pulley to a facility with the resources to treat Mr. Pulley's

condition.

60. At 3:33 a.m. Mr. Pulley's blood pressure was 108/52.  Dr. Innis continued to deviate

from the standard of care by not timely and properly resuscitating Mr. Pulley and

immediately consulting a surgeon at DRMC and/or immediately transferring Mr. Pulley

to a facility with the resources to treat Mr. Pulley's condition.

61. At 3:47 a.m. Mr. Pulley's prothrombin time resulted showing an above high normal of

12.0 (normal is 9.6-11.9).

62. At 3:50 a.m. Dr. Innis ordered Morphine for Mr. Pulley.

63. At 3:54 a.m. Dr. Innis ordered transfusion of two units of packed red blood cells.

However, Dr. Innis continued to deviate from the standard of care by not timely and

properly resuscitating Mr. Pulley and immediately consulting a surgeon at DRMC and/or

immediately transferring Mr. Pulley to a facility with the resources to treat Mr. Pulley's condition.

64. At 3:55 a.m. Mr. Pulley was given Morphine 4 m.g.

65. At 3:56 a.m. Dr. Innis ordered red blood cells, leukoreduced (includes type and screen), as well as a complete blood count with auto differential, for Mr. Pulley.  However, Dr. Innis continued to deviate from the standard of care by not timely and properly resuscitating Mr. Pulley and immediately consulting a surgeon at DRMC and/or immediately transferring Mr. Pulley to a facility with the resources to treat Mr. Pulley's condition.

66. The Salem VAMC later denied Mr. Pulley's transfer to its facility so alternative arrangements were made, namely, to transfer Mr. Pulley to LGH.  This was done around 4:02 a.m. on July 14, 2018 and, at that time, Dr. Innis' diagnosis was gastrointestinal bleed/gastrointestinal hemorrhage.  The Salem VAMC providers deviated from the standard of care by agreeing to the transfer and then later denying it thereby causing a delay of approximately three hours.  Such a delay contributed to Mr. Pulley's hypovolemic shock and death.   In addition, Dr. Innis continued to deviate from the standard of care by not timely and properly resuscitating Mr. Pulley and immediately consulting a surgeon at DRMC and/or immediately transferring Mr. Pulley to a facility with the resources to treat Mr. Pulley's condition.

67. At 4:05 a.m. Mr. Pulley's blood was taken for the complete blood count with auto differential.

68. At 4:09 a.m. Dr. Innis documented that Mr. Pulley was then accepted to Lynchburg General Hospital because the Salem VAMC denied Mr. Pulley's transfer.

69. At 5:18 a.m. Mr. Pulley's laboratory studies resulted showing a below low normal red blood cell count of 2.72 (normal is 4.50-5.90); a critically below low normal hemoglobin of 6.7 (normal is 13.5-17.5); a below low normal hematocrit of 23.6 (normal is 41.0-53.0); and a below low normal platelet count of 92 (normal is 150-440). Dr. Innis continued to deviate from the standard of care by not timely and properly resuscitating Mr. Pulley and immediately consulting a surgeon at DRMC and/or immediately transferring Mr. Pulley to a facility with the resources to treat Mr. Pulley's condition.

70. At 5:34 a.m. Mr. Pulley's crossmatch resulted for unit numbers W055718001463 and W055718001457, both of which were individually 345 ml. Crossmatching is a way for a healthcare provider to test a patient's blood against a donor's blood to make sure they are fully compatible.

71. At 6:02 a.m. Mr. Pulley's blood pressure was 115/53.

72. At 6:17 a.m. Mr. Pulley's blood pressure was 111/54.

73. At 6:30 a.m. Mr. Pulley's blood pressure was 110/56.

74. At 6:45 a.m. Mr. Pulley's blood pressure was 108/51.

75. At 7 a.m. Mr. Pulley's blood pressure was 117/58.

76. At 7:15 a.m. Mr. Pulley's blood pressure was 122/60, and it is documented that the infusion of Mr. Pulley's first unit of packed red blood cells (unit W055718001457) was completed.

77. At 7:26 a.m. Mr. Pulley's blood pressure was 137/62.

78. At 8:08 a.m. Mr. Pulley's blood pressure was 122/54, and Mr. Pulley was transported from DRMC's emergency department to Lynchburg General Hospital via ground unit.

79. In addition to the above, the defendants and their employees were negligent, deviated from the standard of care, and committed wrongful acts and omissions as follows:

    a.   They did not timely treat Mr. Pulley.

    b.   They did not properly treat Mr. Pulley.

    c.   They did not properly understand Mr. Pulley's condition.

    d.   They did not timely understand Mr. Pulley's condition.

    e.   They did not properly work-up Mr. Pulley's condition.

    f.   They did not timely work-up Mr. Pulley's condition.

    g.   They did not properly understand Mr. Pulley's history.

    h.   They did not timely understand Mr. Pulley's history.

    i.   They did not timely diagnose Mr. Pulley's condition.

    j.   They did not properly diagnose Mr. Pulley's condition.

    k.   They did not ensure that Mr. Pulley was timely treated.

    l.   They did not ensure that Mr. Pulley was properly treated.

    m.   They delayed Mr. Pulley's treatment.

    n.   They did not properly communicate with one another.

    o.   They did not timely communicate with one another.

    p.   They did not properly communicate with other individuals.

    q.   They did not timely communicate with other individuals.

80. As a proximate result of the negligence of, and deviations from the standard of care and wrongful acts and omissions by the United States of America's employees, Mr. Pulley suffered his gastrointestinal bleed that led to hypovolemic shock and his July 16, 2018 death.  For example:  If Ms. Siever had not recommended, agreed to perform, and

scheduled Mr. Pulley for his colonoscopy, Mr. Pulley would not have suffered his gastrointestinal bleed that caused his death.  If Dr. Sageer had not agreed to perform and did not perform the colonoscopy, Mr. Pulley would not have suffered his gastrointestinal bleed that caused his death.  If Dr. Sageer had not performed the removal of 19 polyps as he did, Mr. Pulley would not have suffered his gastrointestinal bleed that caused his death.  If Dr. Sageer had not restarted Mr. Pulley's Aspirin 81 mg daily after the colonoscopy, Mr. Pulley would not have suffered his gastrointestinal bleed that caused his death or, at the very least, Mr. Pulley's gastrointestinal bleed would not have been severe thereby avoiding his hypovolemic shock and death.  If Dr. Sageer had not discharged Mr. Pulley home but kept Mr. Pulley at the Salem VAMC for observation, Mr. Pulley's gastrointestinal bleed should have been timely diagnosed and properly treated thereby avoiding his hypovolemic shock and death.  If Charlotte C. Gearhart; Suchet Hemendra Sarda, M.D.; Termecka Brown, R.N.; and/or Traci J. Westberg, R.N. had properly acted on the requested transfer, Mr. Pulley's care and treatment would not have been delayed by approximately three hours thereby contributing to his hypovolemic shock and death.  These deviations proximately resulted in Mr. Pulley's wrongful death that should have been and was completely avoidable.  If the employees of the United States of America had complied with the standard of care, Mr. Pulley's injuries leading to his death would have been avoided.

81. As a proximate result of the negligence of, and deviations from the standard of care and wrongful acts and omissions by Dr. Innis, Mr. Pulley's gastrointestinal bleed caused by the negligence of the employees of the United States of America was not timely and properly diagnosed and treated thereby leading to hypovolemic shock and his July 16,

2018 death.  For example:  If Dr. Innis had timely and properly resuscitated Mr. Pulley, he would not have suffered hypovolemic shock and his July 16, 2018 death.  If Dr. Innis had immediately consulted a gastroenterologist at DRMC, he would have learned that there was no gastroenterologist on call at DRMC.  In which case the standard of care required an immediate consult with a surgeon at DRMC, but Dr. Innis did not do this.  If DRMC had surgery on call, a surgeon would have emergently seen Mr. Pulley, resuscitated Mr. Pulley, and operated on Mr. Pulley to stop his acute gastrointestinal hemorrhage thereby saving Mr. Pulley's life.  If DRMC did not have surgery on call, then the standard of care required emergent transfer to a facility that had the resources to treat Mr. Pulley's acute gastrointestinal hemorrhage, but Dr. Innis did not do this. Instead, Dr. Innis kept Mr. Pulley at DRMC without timely and properly resuscitating Mr. Pulley and ensuring that timely surgical treatment was available to Mr. Pulley.  These deviations proximately resulted in Mr. Pulley's wrongful death that should have been and was completely avoidable.  If Dr. Innis had complied with the standard of care, Mr. Pulley's injuries leading to his death would have been avoided.

82. As a consequence of Mr. Pulley's wrongful death, medical, funeral, and burial expenses were incurred; Mr. Pulley's statutory beneficiaries have suffered and will suffer in the future heart-wrenching sorrow, mental anguish, and solace which includes his society, companionship, comfort, guidance, kindly offices, and advice; and Mr. Pulley's statutory beneficiaries have lost his services, protection, care, and assistance.  Mr. Pulley's statutory beneficiaries include Brenda Pulley (wife of 32 years); and his two adult children, Pamela Pulley Curtis and Everette Keith Pulley.

83. Plaintiff seeks fair compensation to the fullest extent permitted under the law of the Commonwealth of Virginia for Mr. Pulley's sudden, traumatic, preventable and untimely death, occasioned by the malpractice of the defendants and their employees in the amount of $5,000,000.

84. Plaintiff seeks trial by jury on all jury issues and, in addition, seeks an advisory jury on the action against the United States of America pursuant to Rule 39 of the Federal Rules of Civil Procedure.

WHEREFORE, for the foregoing reasons, the Plaintiff, by counsel, moves this Court for judgment against the defendants, jointly and severally, in the amount of $5,000,000 plus her taxable costs with interest on all these amounts from July 16, 2018.

Respectfully Submitted,

BRENDA PULLEY, ADMINISTRATOR OF THE ESTATE OF EVERETTE BERNARD PULLEY, DECEASED,

/s/ Les S. Bowers, Esq.
Anthony M. Russell (VSB No. 44505)
MICHIE HAMLETT, PLLC
215 Market Street, Suite 201 (24011)
P.O. Box 2826
Roanoke, Virginia 24001
P: (540) 492-5300
F: (540) 492-5400
arussell@michiehamlett.com

Les S. Bowers (VSB No. 77840)
MICHIE HAMLETT, PLLC
310 4th Street N.E.
P. O. Box 298
Charlottesville, Virginia 22902
P: (434) 951-7200
F: (434) 951-7256
lbowers@MichieHamlett.com

*Counsel for Plaintiff*